UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CLEAVEN JOHNSON,
    *Plaintiffs*                               3:11cv00996 (WWE)

V.

JOETTE KATZ (Official
Capacity), CHARLOTTE SCHMID (Individual
Capacity), MALCOLM BLUE (Official and
Individual Capacity), GAYLE HOFFMAN
(Official Capacity); JEANNETTE PEREZ
(Official and Individual Capacity) ,
RAQUELINDA CABRAL (Official and
Individual Capacity); STEFFANIA HANNA
(Official and Individual Capacity); MAUREEN
AUGEUR (Official and Individual Capacity); DANA
GOLDBERG (Official and Individual Capacity)
    *Defendants*                               SEPTEMBER 1, 2014

## **SIXTH AMENDED COMPLAINT**

### **I.**     **INTRODUCTION**

1.     The Plaintiff, Cleaven Johnson, files nunc pro tunc and brings this civil action as a result of the violation of their rights secured and protected by the Civil Rights Act of 1964 as amended, the Civil Rights Act of 1871 (U.S.C. §1983, 1981), inasmuch as the Defendants have subjected the Plaintiff to race discrimination, harassment and retaliation for engaging in protected activity in violation of federal law as well as in violation of the federal constitution.

### **II.**     **JURISDICTION**

2.     Jurisdiction of this matter is invoked under 28 U.S.C. § 1331, in that the District Court shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States.

3. This Court has supplemental jurisdiction over the Plaintiff's state law claims in accordance with 28 U.S.C. § 1367.

### III. VENUE

4. The appropriate venue is the United States District of Connecticut and is proper in accordance with 28 U.S.C. §1391, in that all of the acts and/or omissions giving rise to the claims occurred within this judicial district.

### IV. PARTIES

5. The Plaintiff, Cleaven Johnson, (hereinafter referred to as "Johnson"), is an African-American male and citizen of the United States, who resides in New Haven, Connecticut.

6. The Department of Children and Families, (hereinafter referred to as "DCF,") is an administrative agency, which has among other statutorily mandated duties and authority, the responsibility to plan, create, develop, administer and evaluate a comprehensive and integrated statewide program of social services for families, including preventative programs for children with behavioral problems.

7. Defendant Joette Katz (hereinafter referred to as "Katz") is a white female, who at all times material herein, has been employed as the Commissioner of DCF, and as such has all power necessary to administer the DCF pursuant to statutory mandate.

8. Defendant Malcolm Blue (hereinafter referred to as "Blue") is an African American black male, who at all times material herein, has been employed by DCF as an Area Director.

9. Defendant Gayle Hoffman (hereinafter referred to as "Hoffman") is a white female, who at all times material herein, has been employed by DCF as Program Manager.

10. Defendant Jeannette Perez (hereinafter referred to as "Perez") is a Hispanic (non black) female, who at all times material herein, has been employed by DCF as Principal Personnel

Officer.

11. Defendant Requelinda Cabral (hereinafter referred to as "Cabral") is an African-American, who at all times material herein, has been employed as a Social Work Supervisor.

12. Defendant Charlotte Schmid (hereinafter referred to as "Schmid") is a white female, who at all times material herein, has been employed by DCF as Social Worker.

13. Defendant Steffania Hanna (hereinafter referred to as "Hanna") is white female, who at all times material herein has been employed by DCF as Social Work Supervisor/Training Instructor.

14. Defendant Maureen Augeur (hereinafter referred to as "Augeur") is white female, who at all times material herein, has been employed by DCF as Social Work Supervisor/Training Instructor.

15. Defendant Dana Goldberg (hereinafter referred to as "Goldberg") is white female who at all times material herein, has been employed by DCF as Social Work Supervisor/Training Instructor.

## V. FACTS

16. Plaintiff Cleaven Johnson has been employed by the Department of Children and Families since July 16, 2010. His initial job title was "Social Worker Trainee" and he was assigned to work in DCF's southwestern regional office located in the City of Bridgeport. Plaintiff was fully qualified for the position.

17. Plaintiff's employment by DCF only occurred as a consequence of his having filed a discrimination complaint against DCF with the Connecticut Commission on Human Rights and Opportunities (hereinafter "CHRO") on or about Spring 2008.

18. In his CHRO complaint, Plaintiff alleged that he was subjected to illegal discriminatory conduct by DCF when DCF refused to fulfill its previous offer to hire after DCF learned that he

had previously been arrested years earlier and charged with breach of peace.

19.     DCF's refusal to hire the Plaintiff was a violation of Conn. Gen. Stat. § 46a-80. Although reference is made to the violation of §a-80, Plaintiff makes no claim under that statute.

20.     DCF refused to hire Plaintiff allegedly after it learned that the Plaintiff had been arrested as a result of participating in a peaceful march and demonstration led by Reverend Jesse Jackson along with other members of the clergy who were at the time lending their support to striking workers employed by Yale University in New Haven, Connecticut. The charges against Plaintiff were eventually dismissed.

21.     Plaintiff's CHRO complaint was ultimately settled by a monetary payment to him and the offer of employment was to be honored by DCF when the next available social worker trainee position became open. The Settlement Agreement pertaining to Plaintiff's CHRO complaint was finalized and executed on or about May 2010.

22.     In accordance with the terms of the Settlement Agreement, Plaintiff was finally offered and accepted the position of social worker trainee in DCF's Bridgeport office. He began training on July 16, 2010.

23.     DCF wasted no time in engaging in an unlawful and mean-spirited scheme of retaliation against the Plaintiff.

24     . Firstly, during the month of September of 2010, less than eight (8) weeks on the job, three (3) training class instructors made complaints against Plaintiff falsely alleging that he engaged in misconduct. The complaints consisted of blatant lies and the charges were clearly unwarranted and fabricated.

25.     The first false complaint filed against the Plaintiff on September 14, 2010, came from Ms. Steffania Hanna, who complained that Plaintiff "sighed" loudly in class. She complained to a

liaison, Anthony Gay, that this "sighing" was offensive. Ms. Hanna's complaint regarding the Plaintiff's offensive sighing belies all sound reasoning, especially in light of the fact that she herself had on at least four (4) occasions during her presentation that same day used the "F" word during her classroom presentation. On another occasion on October 18, 2010 she had used the "F" word five (5) times during her classroom presentation.

26. The second false complaint, also filed on September 14, 2010, came from Ms. Maureen Augeur. She falsely alleged that while Plaintiff was in attendance in her class she observed the Plaintiff use his cellular telephone for purposes of "texting." Augeur likewise reported this alleged "texting" misconduct to Plaintiff's liaison. At no time was Plaintiff "texting" in class and indeed has never sent a text message before in his life. Plaintiff has simply never deemed it necessary to learn to use the texting feature on his telephone in order to engage in this type of messaging. Nor has the Plaintiff ever accessed the internet via use of his cellular telephone during class.

27. Thirdly, on September 22, 2010, a complaint was filed by instructor Dana Goldberg who claimed that Plaintiff fell asleep while in class.

28. On October 7, 2010, Ms. Goldberg herself fell asleep in class for several seconds while co-teaching.

29. In a subsequent meeting Plaintiff met with his liaison and his supervisor, Cabral, where they discussed Goldberg's false allegations. Plaintiff admitted that he had closed his eyes for 4 to 5 seconds, however, he denied that he was asleep.

30. During the course of this same meeting Plaintiff informed his supervisor, Cabral that he had a sleep apnea problem for which he was being treated.

31. As a consequence of learning that Plaintiff had a sleep apnea problem, DCF engaged in

yet another act of retaliation and harassment when it forbid him from driving for the agency. This limitation placed on the performance of his duties was made without any legitimate reason and only served to greatly hamper his ability to perform his duties in the field. There was no need or medical justification for DCF's decision to limit Plaintiff's driving while on agency work.

32. Plaintiff was later restored to permissive driving after obtaining medical documentation regarding his condition which indicated that he was fit to drive. Nevertheless, Plaintiff was prohibited from driving while on duty for several weeks.

33. These three (3) complaints filed by Hanna, Augeur and Goldberg against Plaintiff were all clearly pretextual and without justification as they were clearly not based on any misconduct on his part.

34. DCF was motivated to pursue these false complaints against Plaintiff in furtherance of its effort to subject him to harassment and retaliation for his engaging in protected activity, namely pursuing the CHRO complaint referenced above.

35. DCF was notified in writing, by letter from Plaintiff's attorney dated January 10, 2011, that these retaliatory complaints had unjustifiably been fabricated against Plaintiff engaged in protected activity when he protested, through his attorney, the unlawful conduct of the three training supervisors.

36. Three (3) days later, on January 13, 2011, Plaintiff's supervisor, Cabral gave him a less than satisfactory performance evaluation. This unsatisfactory rating was an unwarranted rating of his performance which at all times material herein has been satisfactory and exemplary. The issuance of this rating by Cabral was a further act of retaliation and harassment.

37. In addition, when Plaintiff received this performance review, Cabral rated his performance as merely "fair" in several categories after having only recently introducing new work criteria that

had not been given to him during the relevant performance period being rated. Further, Cabral's newly imposed performance criteria were not being imposed on other social worker trainees. Cabral's aforementioned misconduct constitutes yet another instance of harassment and retaliation directed against the Plaintiff for engaging in protected activity.

38. During this same period of time, Plaintiff was informed by some of his coworkers that the fact of his CHRO complaint was common knowledge. The releasing of information concerning his CHRO complaint was motivated by a desire on the part of DCF management to subject the Plaintiff to harassment and embarrassment as well as retaliation for having engaged in protected conduct.

39. On February 18, 2011, Plaintiff learned from one of his clients (hereinafter referred to as "client no. 1") that she had been involuntarily solicited by DCF Social Worker Schmid to write a letter falsely stating that the client wished to have him removed as her social worker. According to the client she protested Schmid's request and notified Schmid that she had no problems with Plaintiff or his performance and that she did not wish to have a change in social worker assigned to her case. However, she did have a problem with DCF for other reasons not related to the Plaintiff.

40. Schmid also accompanied Plaintiff on a home visit on February 3, 2011, to client no.1 in order to confirm whether the client was being compliant with her treatment plan. The client had a substance abuse problem. Schmid did indeed confirm along with Plaintiff that the client was compliant in all respects.

41. During this home visit Plaintiff witnessed client no.1 provide Schmid with a list of the names and telephone numbers of all of her treating physicians in order that Schmid could confirm her lawful use of prescription medications.

42. The first letter was written in general about DCF. This was not good enough for Schmid, who then asked client number one for another letter stating that she wanted Plaintiff removed from her case. Client number one did write an email and provided Plaintiff with a copy. The email does not state that the client wished to have Plaintiff removed as her social worker.

43. Without warning, legitimate reason or provocation, Schmid attacked the Plaintiff, informing him that she would make trouble for him based on the derogatory statement that she was pressuring client number one to provide to her. Upon information and belief, Schmid has been involved in engaging in a similar pattern of misconduct of making false accusations of workplace misconduct towards other African American males.

44. Not long after client number one wrote this email critical of DCF, Schmid requested for a second time that client number one write another email stating she wanted to have another social worker assigned to her case in place of the Plaintiff. When client number one again refused Schmid's demand, Schmid retaliated against the client by filing a groundless neglect petition against client number one in violation of the client's and the client's children's civil rights.

45. Prior to client number one's refusal to give into Schmid's repeated demands for her to produce a false and derogatory statement concerning the Plaintiff, Schmid had not deemed client number one to be neglectful of her children due to drug addiction problem. Nor had Plaintiff.

46. Plaintiff learned of Schmid's unlawful misconduct when client number one informed Him on February 18, 2011, that she needed a lawyer.

47. Upon information and belief, Schmid, acting as agent for and at the behest of DCF management, tried to use client number one to carry out retaliation against Plaintiff on account of his filing the CHRO charge and for protesting the retaliatory actions of the three (3) white female

DCF instructors referenced above.

48. Upon further information and belief, DCF managers, through Schmid, sought to leverage the threat of a neglect petition against this innocent client number one because she would not provide false negative statements regarding Plaintiff's job performance.

49. As a consequence of her misconduct and abuse of client number one's civil rights, Schmid was given the proverbial slap on the wrist, whereby management prohibited her from engaging in field assignments and placed her on desk duty for a period of a few weeks while she was being investigated for a. complaint made by another agency. Defendant Blue stated to Plaintiff that while Schmid was being moved to desk duty, the agency had only removed Plaintiff from the case assignment. However, Defendant Blue later blamed Plaintiff for the mishandling of this case.

50. Upon information and belief Schmid was never formally disciplined as a result of her abuse of client no. 1 because DCF management did not intend to punish her for her misconduct.

51. On or about March 4, 2011 Plaintiff filed a complaint of discrimination and retaliation with the Commission on Human Rights & Opportunities against State of Connecticut Department of Children & Families in a case docketed as CHRO Case No. 1120314 and EEOC Case No. 16A-2011-00644C.

52. On or about March 31, 2011, Plaintiff was given a written memorandum from Defendants Blue and Hoffman (hereinafter referred to as "Blue-Hoffman memorandum"), describing certain alleged "trainee concerns" on the part of the Plaintiff.

53. Because the claims made in the memorandum were inaccurate and in some instances outright fabrications regarding Plaintiff's work performance, he wrote a rebuttal to the claims. Writing the rebuttal to these claims was an act of protected activity by Plaintiff in opposing unlawful retaliatory action against him.

54. The essence of the claims made in the Blue/Hoffman memorandum was that the agency claimed that Plaintiff had a problem with connecting with his clients and had an unstable case load.

55. Some of the claims named in the Blue-Hoffman memorandum were not even mentioned as problems in Plaintiff's four month probationary evaluation, which covered the period of time he worked with the said clients described in the Blue-Hoffman memorandum.

56. After receipt of the Blue-Hoffman memorandum, Plaintiff spoke with his supervisor Cabral, who insisted that he had been performing up to her standards and that she had made no complaints about his performance. In fact, Cabral stated that she was not going to lie for anyone to back up the management claims raised in the Blue-Hoffman memorandum.

57. On April 6, 2011 Plaintiff wrote a lengthy memorandum to Blue and Hoffman responding to the allegations of "trainee concerns". Further, he made note of the CHRO complaint that had been filed and that he believed the written memorandum to be evidence of retaliatory disciplinary action against him, that it was evidence of DCF's strong bias against African-American males and that it was creating the basis for a decision to terminate him as his working test period approached.

58. Cabral did inform Plaintiff on or about April 4, 2011, that she had been questioned closely by DCF managers Blue and Hoffman regarding Plaintiff's work and that she had not given any negative feedback to them regarding Plaintiff's work performance. Cabral told Plaintiff that she was not aware of the contents of the memorandum and was not involved in its drafting.

59. This entire episode surrounding the issuance of the Blue-Hoffman memorandum constitutes further acts of harassment and retaliation on the part of DCF management.

60. On or about April 8, 2011 Plaintiff filed an amended complaint with CHRO alleging further acts of retaliation. This amended complaint alleged that Defendants Blue and Hoffman

gave Plaintiff a written memorandum stating that they had certain "trainee concerns". These purported "trainee concerns" included claims that Plaintiff had a problem connecting with clients and therefore had an unstable case load. Some of these claims had not even been mentioned to Plaintiff at the time of his written four month evaluation.

61. In one instance Defendants claimed that Plaintiff had a case that was required to be reassigned to another worker. In fact, the case was re-assigned after a male in the home of Plaintiff's client threatened violence against Plaintiff and displayed what appeared to be a weapon. Moreover, a threat assessment team meeting was held and a police report was ultimately filed against this male. Under such circumstances, it could hardly be said that Plaintiff caused an instability in his case load when his personal safety should have been the agency's primary concern.

62. In another instance, Defendants Blue and Hoffman noted trainee concerns in an instance when a client initiated a discussion with Plaintiff regarding the church that she attended which then led to further conversations about the fact that Plaintiff was a pastor. When Plaintiff informed his immediate supervisor about this, she indicated only that it would be inappropriate for Plaintiff to initiate a discussion about his pastoral calling but that there was no problem with the discussion in the context when the client initiated the matter.

63. On or about May 5, 2011 Defendant Jeanette Perez met with Plaintiff to discuss alleged concerns that she had regarding his performance. Defendant Perez had conducted her own review of Plaintiff's performance, including but not limited to soliciting information directly from Plaintiff's clients.

64. Perez addressed alleged concerns that Plaintiff had clients who complained about him and that she found there to be common threads in these complaints. Included among these complaints

related by Perez was a client who alleged that Plaintiff had included inaccurate information in his family case plan. The client had, however, been given the opportunity to review the document and had signed off on it.

65. Perez raised another alleged concern from one of Plaintiff's clients who complained that Plaintiff interacted very little with her teenaged daughter during home visits and that she found the home visits to not be helpful. Perez found there to be some common thread to this client's complaint despite the fact that Plaintiff explained that he deliberately avoided being around the teenager daughter except in the presence of her mother because the issue that had caused DCF intervention was the fact that the teenager was failing to attend school and was involved with an older man. Instead of viewing Plaintiff's decision to avoid placing himself in a compromising situation with a teenager who was already displaying precocious behavior towards men, Perez utilized this as a means of retaliating against Plaintiff. Plaintiff managed this case for some four months without a complaint. After re-assignment to another social worker, the case was closed after only one visit thus establishing how close the matter was to completion prior to Perez' solicitation of a complaint regarding Plaintiff.

66. Perez further complained that some of Plaintiff's clients found him to be "intimidating". It goes without saying that intervention by DCF into individual family life is almost always deemed to be intimidating except for those families who have sought out DCF assistance.

67. On May 13, 2011, DCF terminated Plaintiff's employment, claiming that his work performance had declined since his last evaluation and that he was not suited as a social worker. This assessment was groundless and his termination was unwarranted as the Plaintiff performed his work responsibilities, at all times material herein, in a satisfactory and exemplary manner.

68. Defendants Cabral, Hoffman, Blue and Perez signed off on the last performance issued

to Plaintiff immediately before he was terminated. These Defendants were well aware that the performance review was not a fair and accurate assessment of the Plaintiff's performance. Nevertheless, these Defendants engaged in further acts of discrimination, harassment and retaliation against the Plaintiff by signing off on the unfair and inaccurate performance review and arranging for his termination.

69. DCF management has had in place a long term policy of engaging in misconduct in relation to its black, African American social workers. The various acts of misconduct described hereinabove on part of the Defendants are typical and exemplary of the type of misconduct that is directed against black, African American social workers, and while both females and males are targeted by DCF management, black male social workers seem to receive the brunt of DCF management's abuse.

70. DCF management is and historically has been dominated by white women who are less culturally competent especially as it concerns the handling of the disproportionately high percentage of minority children, troubled youth and families under its watch.

71. African American male social workers are targeted for racially discriminatory and retaliatory adverse employment actions, in part because of their raising of concerns over DCF's heavy-handed, over reaching and often illegal tactics at disrupting minority households even under the most questionable of circumstances. The circumstances described above concerning Defendant Schmid's misconduct and civil rights violations of client number one, as well as DCF management's almost non-response to Schmid's conduct, bear witness to these facts.

72. DCF engages in an unlawful pattern of racial discrimination in its recruitment, hiring and discipline of black, African American social workers.

73. African American social workers, particularly males, are targeted for disparate treatment

in recruitment, hiring and discipline. DCF maintains a policy and officially sanctioned practice of subjecting African-American males to harsher evaluation standards in the hiring process than other applicant counterparts are subjected to, so as to unduly and unlawfully limit their chances for being hired. For those that are hired, they are subjected to harsher disciplinary standards, especially during their probationary periods with the result that a disproportionately high number of them are eliminated during their probationary periods as well as those that are terminated during their permanent status.

**FIRST COUNT:** **42 U.S.C. § 1983- FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION; (As to Defendants Katz, Steffania Hanna, Maureen Augeur, Dana Goldberg, Charlotte Schmid, Requelinda Cabral, Gayle Hoffman, Malcolm Blue and Jeannette Perez in their Official Capacities)**

1. - 73.  Paragraphs 1 through 73- are incorporated herein made paragraphs 1 through 73 of this First Count.

74. As a result of Defendants' conduct Plaintiff Cleaven Johnson has been subjected to unlawful racial discrimination and unequal treatment all in violation of the Fourteenth Amendment to the U.S. Constitution.

75. Plaintiff Johnson has suffered great humiliation and emotional distress as well as the loss of income and harm to his professional reputation..

76. Plaintiff has been damaged thereby.

**SECOND COUNT:** **42 U.S.C. § 1983, 1981- RACE DISCRIMINATION; (Defendants Steffania Hanna, Maureen Augeur, Dana Goldberg, Charlotte Schmid, Requelinda Cabral, Gayle Hoffman, Malcolm Blue and Jeannette Perez in their Individual Capacities)**

1. -73. Paragraphs 1 through 73- are incorporated herein made paragraphs 1 through 73 of this Second Count.

74. The acts of defendants Hanna, Augeur, Goldberg, Schmid, Cabral, Hoffman, Blue, and

Perez were in furtherance of DCF's policy and practice of discriminating against African-American employees, particularly African-American males, in violation of their rights to make and enforce contracts, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

75.     Plaintiff Johnson has been damaged thereby.

**THIRD COUNT:     42 U.S.C. § 1983, 1981- RETALIATION; (as to Defendants Steffania Hanna, Maureen Augeur, Dana Goldberg, Charlotte Schmid, Requelinda Cabral, Gayle Hoffman, Malcolm Blue and Jeannette Perez in their Individual Capacities)**

1. - 73. Paragraphs 1 through 73- are incorporated herein made paragraphs 1 through 73 of this Third Count.

74.     The acts of defendants Hanna, Augeur, Goldberg, Schmid, Cabral, Hoffman, Blue, and Perez were in retaliation for Plaintiff Johnson's engaging in protected activity of protesting DCF's initial refusal to hire him, and his protests of their actions designed to interfere with his employment contract and their on-going pattern of unlawful discrimination against black, African-American employees.

75.     Plaintiff Johnson has been damaged thereby.

**FOURTH COUNT: TITLE VII OF THE CIVIL RIGHTS ACTS OF 1964 (RACE DISCRIMINATION) (As to Defendant DCF)**

1. - 73. Paragraphs 1 through 73- are incorporated herein made paragraphs 1 through 73 of this Fourth Count.

74.     As a result of Defendants' conduct Plaintiff Cleaven Johnson has been subjected to unlawful racial discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended.

75.     Plaintiff Johnson has suffered great humiliation and emotional distress as well as the loss of income and harm to his professional reputation..

75. Plaintiff has been damaged thereby.

**FIFTH COUNT:    TITLE VII OF THE CIVIL RIGHTS ACTS OF 1964
                 (RETALIATION) (As to Defendant DCF)**

1. - 73. Paragraphs 1 through 73- are incorporated herein made paragraphs 1 through 73 of this Fifth Count.

74.    As a result of Defendants' conduct Plaintiff Cleaven Johnson has been subjected to unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended.

75.    Plaintiff Johnson has suffered great humiliation and emotional distress as well as the loss of income and harm to his professional reputation.

76.    Plaintiff has been damaged thereby.

    **WHEREFORE**, Plaintiffs prays for the following relief:

    A.    A trial by jury;

    B.    Compensatory damages;

    C.     Punitive damages (as to Individual defendants in their individual capacities)

    D.    Attorney's fees and costs;

    E.    Such further and equitable relief as the Court may deem appropriate.

                    The Plaintiff,

                    By:__/s/Josephine S. Miller_____
                    Josephine S. Miller, ct27039
                    152 Deer Hill Avenue, Suite 302
                    Danbury, CT 06810
                    Tel: (203) 512-2795
                    Fax: (203) 702-5188
                    Email: jmillerlaw@sbcglogal.net

**CERTIFICATION**

I hereby certify that on September 1, 2014 a copy of the foregoing Sixth Amended Complaint was sent via e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.


*/s/Josephine S. Miller*
Josephine S. Miller